Eli M. Kantor (SBN 71411)
eli@elikantorlaw.com
Jonathan Kantor (SBN 313256)
jonathan@elikantorlaw.com
**LAW OFFICE OF ELI KANTOR**
9595 Wilshire Boulevard, Suite 405
Beverly Hills, CA 90212
Telephone: (310) 274-8216
Fax: (310) 273-6016

Attorneys for Defendant
DANIEL SCHNEIDER

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DANIEL SCHNEIDER,** an Individual )<br><br>           **Plaintiff,** )<br><br>vs. )<br><br>**SPORTS CONTENT CREATION, LLC dba X GAMES a Delaware Limited Liability Company;** and **DOES 1-50 Inclusive.** )<br><br>           **Defendants.** ) | **CASE NO.:**<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Declaratory Judgment;<br>2. Breach of Contract;<br>3. Breach of the Implied Covenant of Good Faith and Fair Dealing;<br>4. Promissory Estoppel;<br>5. Violation of *Labor Code* §203 – Waiting Time Penalties;<br>6. Violation of *Business and Professions Code* §17200;<br>7. Unjust Enrichment.<br><br>**DEMAND FOR JURY TRIAL** |

## **INTRODUCTION**

1.      "He who shakes the tree is the one to gather its fruit." *EA Street Western Realty Agency, Inc. v. Lewis* (1967) 255 Cal App. 2d 254. Plaintiff Daniel Schneider ("SCHNEIDER") entered into a signed written agreement with Defendant SPORTS CONTENT CREATION LLC DBA X GAMES (herein "X-GAMES") (the "AGREEMENT") on May 10, 2023 (Exhibit 1) to work as a consultant on the development of distribution of Defendant X-GAMES' content where he was to be paid a set fee per month plus a 10% commission of revenue generated, if Defendant made a deal with any Third Party for the distribution of X-GAMES that SCHNEIDER had worked on. The Commission AGREEMENT explicitly survived the termination of the AGREEMENT. Plaintiff SCHNEIDER started and engaged in negotiations for a deal for the distribution of X-GAMES on ROKU and was the *procuring cause* of the deal, as is more fully set forth below. Defendant X-GAMES terminated its AGREEMENT with SCHNEIDER on or about September 11, 2023. Thereafter, on December 18, 2024 Defendant X-GAMES announced that it was launching streaming of X-GAMES with ROKU and it started streaming X-GAMES content on ROKU in January, 2025. To date, Defendant X-GAMES has refused to honor the AGREEMENT and has repudiated it despite SCHNEIDER's written demands for payment and a full accounting.

**PARTIES**

2.     Defendant SPORTS CONTENT CREATION LLC, dba X-GAMES is a Delaware Limited Liability Company. It is registered to do business in the State of California. X-GAMES has held its events in Ventura, California in July, 2023 and June, 2024. X-GAMES are a series of events, akin to the Olympics involving extreme sports, such as snowboarding, skateboarding, and BMX biking.

3.     Plaintiff Daniel Schneider ("SCHNEIDER") is a resident of the County of Los Angeles. At all times material herein, he was employed by Defendant X-GAMES and performed services for it in the County of Los Angeles.

**JURISDICTION AND VENUE**

4.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs and there is a complete diversity of citizenship between Plaintiff and one of the Defendants.

5.     This Court has jurisdiction over Plaintiff's related state and common law claims pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. §1367.

6.     This Court has personal jurisdiction over Defendant X-GAMES and venue is proper in the Central District of California because it conducted business and entered into a contract with Defendant SCHNEIDER who is a California resident in the County of Los Angeles.

7.      Plaintiff SCHNEIDER entered into a written contract – the AGREEMENT (Exhibit 1) with Defendant X-GAMES in the County of Los Angeles to be performed by SCHNEIDER in the County of Los Angeles in the venue of this Court. Plaintiff performed his services for Defendants in the County of Los Angeles. Defendants breached the AGREEMENT by failing to pay Plaintiff for his services in the County of Los Angeles, despite his repeated demands for payment.

8.      Defendant X-GAMES has expressly agreed to submit to the jurisdiction and venue of this Court when it signed the AGREEMENT providing that: "its validity, construction and effect shall be governed by and enforced in accordance with the internal **laws of the State of California… and both parties agree to the exclusive jurisdiction and venue of the courts thereof.**" (Emphasis Added)

9.      Plaintiff was employed in, and significant events material to this case occurred within the County of Los Angeles. The obligations and liability complained of arose in the County of Los Angeles and Plaintiff suffered injury in the County of Los Angeles, in the venue of this Court.

10.     The true names and capacities of Defendants named herein as Does 1 through 50, whether individual, corporate, associate or otherwise, and the true involvement of Defendants sued herein as Does 1 through 50 are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff will amend the Complaint to show the true names, capacities, and involvement of Does 1 through 50 when ascertained. Plaintiff is informed and believes and thereon alleges

that each of the Defendants designated as a "Doe" is responsible in some manner for the events and happenings referred to herein, and that Plaintiff's injuries and damages as hereinafter set forth were proximately caused by said Defendants.

11.     Plaintiff is informed and believes and thereon alleges that each of the Defendants sued herein is or was the agent, employee, partner, joint-employer, and/or representative of one or more of the remaining Defendants, and each of them was at all times acting within the purpose and scope of such agency and employment. Plaintiff is further informed and believes that each of the Defendants herein gave consent to, ratified, and authorized the acts alleged herein to each of the remaining Defendants.

## GENERAL ALLEGATIONS

12.     SCHNEIDER has a background in buying and selling content for streaming services, on various streaming platforms, because of his more than 10 years of experience working in the streaming industry. In or about April 2023, SCHNEIDER engaged in a series of correspondence, e-mails and telephone conversations with Steve Flisler, the *then* Chief Executive Officer of X-GAMES about SCHNEIDER'S original and unique idea of bringing X-GAMES to select streaming services. The revenue streams would be generated through carriage agreements between X-GAMES and the Streaming Platform. (See Exhibit 2 - Email Thread Between Daniel Schneider and Steve Flisler).

13.     Steve Flisler, the CEO of X-GAMES was interested in what SCHNEIDER had to offer and very quickly wanted to engage in a consulting agreement with SCHNEIDER. Steve Flisler and Justin Harris, the "CFO" (Chief Financial Officer) of X-GAMES, asked SCHNEIDER to come up with a financial forecast on how to use the platform and provide research on which third party distributors would be most optimal. SCHNEIDER provided them with what they requested. (See Exhibit 3 -April, 2023 E-mail Exchange between SCHNEIDER and Steve Flisler and Justin Harris).

## The Agreement

14.     After a series of arm's length negotiations, on or about May 10, 2023, SCHNEIDER entered into a written Independent Contractor Agreement for the development of distribution opportunities for Defendant X-GAMES content (herein "the AGREEMENT"). A copy of the AGREEMENT is attached as Exhibit Number 1. The AGREEMENT provided that SCHNEIDER would pursue and engage in conversations and set up opportunities with various companies for the purpose of distributing DEFENDANT X-GAMES' content on their platforms. In initial negotiations between SCHNEIDER and DEFENDANT X-GAMES, X-GAMES expressed that it preferred to structure deals based on commission, stating that: "we would like to make sure that the bulk of your fee is *performance based* so that we can succeed together." (emphasis added); (See Exhibit 4 -E-mail from Justin Harris, CFO of X-GAMES to SCHNEIDER).  The AGREEMENT provided that, in consideration

for SCHNEIDER'S services, X-GAMES agreed to pay him $5,000 per month. (See Exhibit 1-The AGREEMENT). The AGREEMENT explicitly stated that SCHNEIDER would receive "an additional Ten Percent (10%) of revenue generated from Platforms ("**Commission**"). Commission shall consist of revenue generated from Carriage that I.C. ("SCHNEIDER") *started and engaged*. For clarity, Commission will be paid to SCHNEIDER even if Term has concluded. All fees shall be paid within twenty (20) days of the Company's receipt of invoice." (Emphasis Added) (See Exhibit 1-The AGREEMENT). The AGREEMENT was negotiated with the CFO of X-GAMES, Justin Harris and CEO Steve Flisler, and executed by SCHNEIDER and Justin Harris, who, as corporate officers, had the power to bind X-GAMES.

15.    X-GAMES told SCHNEIDER that it would compensate him through its third party sub-contractor, MEDIA SERVICES PAYROLL LLC (herein "MEDIA"). (See Exhibit 5 - MEDIA SERVICES PAYROLL W-2 to SCHNEIDER). (Exhibit 6 - Pay Stubs) SCHNEIDER completed all required employment forms with MEDIA, including Form I-9 and W-4, to commence employment.

## Meetings with Platforms

16.    Thereafter, pursuant to their AGREEMENT, SCHNEIDER initiated a series of events that ultimately resulted in a completed deal with ROKU. Thus, he actively sought to make a deal for DEFENDANT X GAMES' content on various platforms. He set up and held in-person and video conference meetings and

exchanged numerous emails with the following Platforms: **ROKU**, Samsung, Pluto TV, LG, Vizio, Tubi, Sling TV, and Xumo. He also set up and held meetings and exchanged numerous e-mails with Technological Providers, including Frequency Networks, which are necessary to deliver the product to the platform so the consumer can access it on their devices.

### ROKU

17.     SCHNEIDER told Steve Flisler and Justin Harris that he would use his *existing connections* with ROKU, a content distributor, to try to initiate a deal where Defendant X-GAMES would stream its content on ROKU. Significantly, at that time X-GAMES did not have any connections with ROKU. Thereafter, SCHNEIDER reached out to Michael Kohn, a Manager at ROKU, about creating a deal to have DEFENDANT X-GAMES' content distributed on the ROKU channel. SCHNEIDER knew Michael Kohn through prior experience in the industry. ROKU is based in California and has offices in Los Angeles and San Jose. ROKU is a media company that provides content for viewers to watch. Then SCHNEIDER participated in a series of correspondence, meetings via Zoom, and an *in-person* meeting at ROKU's Santa Monica office, in the venue of this Court, and telephone conversations where he discussed distributing X-GAMES content on ROKU. The persons who participated in the meetings were SCHNEIDER, Steve Flisler, CEO of DEFENDANT X-GAMES, Michael Kohn, Manager at the ROKU Channel, Parker

Bova, Senior Content Acquisition Manager at ROKU, and Joe Franzetta, Head of Sports at ROKU.

18.    SCHNEIDER spent a considerable amount of time meeting with Steve Flisler, CEO of DEFENDANT X-GAMES, preparing negotiation strategies for ROKU, including which live, archival, and new content to present to ROKU for distribution, and various financial projections.

19.    On May 19, 2023, SCHNEIDER emailed Michael Kohn at ROKU and told him that he was working with X-GAMES and wanted to discuss bringing their content to ROKU. On May 23, 2023, SCHNEIDER held a Google Video meeting with Michael Kohn and Steve Flisler about bringing X Games to ROKU. (Exhibit 7) Kohn determined a follow up meeting was necessary with more stakeholders from ROKU. On May 26, 2023, SCHNEIDER had a Zoom meeting with Michael Kohn, Joe Franzetta, Parker Bova, and Steve Flisler regarding X-GAMES and ROKU. (Exhibit 7) On June 2, 2023, SCHNEIDER had another Zoom meeting with Michael Kohn, Joe Franzetta, and Steve Flisler to further develop the opportunity between X-GAMES and ROKU. (Exhibit 7)

20.    In early June, 2023, SCHNEIDER attended StreamTV with Steve Flisler. StreamTV is an annual conference of the leaders of the streaming industry. In the past, SCHNEIDER had spoken as a panelist and as a moderator at StreamTV's conference. Also, in a prior role at a business news streaming network, SCHNEIDER had worked with the conference organizers to broadcast interviews onsite with

industry leaders. Therefore, SCHNEIDER was able to arrange for Steve Flisler to be a keynote speaker at the 2023 StreamTV conference in Denver, Colorado. During the StreamTV conference SCHNEIDER introduced Steve Flisler to multiple business leaders in the streaming industry and held multiple meetings with streaming platforms about the potential distribution of X-GAMES content on their platforms, which resulted in a "term sheet" offer from one of the leading platforms. On June 15, 2023, Flisler emailed SCHNEIDER praising him for his business savvy and thanking him for the connections he secured during StreamTV. (Exhibit 8).

21.    On June 15, 2023, SCHNEIDER had a Zoom call with Steve Flisler and the representatives from ROKU, Joe Franzetta, Parker Bova, and Michael Kohn. During this meeting, they discussed how they could get X-GAMES content onto ROKU exclusively. (Exhibit 9)

22.    On or about June 16, 2023, SCHNEIDER held a follow-up Zoom conversation with Michael Kohn, further discussing how they could put X-GAMES content onto ROKU. (Exhibit 10)

23.    On or about June 29, 2023 SCHNEIDER had another Zoom conversation with Steve Flisler discussing what a deal could look like, including the presentation of X-GAMES content on ROKU.

### SCHNEIDER Makes The Sales Pitch To ROKU

24.    On July 14, 2023, SCHNEIDER and Steve Flisler had an *in-person* meeting at ROKU's offices in Santa Monica, California with Joe Franzetta, Parker

COMPLAINT FOR DAMAGES

Bova, and Michael Kohn. They discussed how, in an exclusive deal, the X-GAMES content would be presented and monetized; and how ad sales for the X-GAMES content on ROKU would work. (Exhibit 11)

25.     During that meeting, SCHNEIDER made a sales presentation with a slide deck which he had prepared for the meeting. He projected the slides onto ROKU's big screen in the meeting room. The conversation centered around striking a deal for carriage of X-GAMES on ROKU and how to optimize revenue. This meeting lasted for about 1.5 hours.

26.     On July 21, 2023, X-GAMES held their summer event at the Ventura County Fairgrounds in Ventura, California. SCHNEIDER invited numerous sales prospects, including ROKU and Samsung, to attend this event. SCHNEIDER personally attended the event and walked the prospects through it.

27.     On August 1, 2023, ROKU updated SCHNEIDER and Flisler that the ROKU team was, "actively working through our internal modeling and approval process to get us to the next step in our discussions." (Exhibit 12)

28.     On August 11, 2023, SCHNEIDER'S term with X-GAMES was automatically extended since there were active negotiations ongoing with multiple platforms. (See Exhibit 1 – 1. Term).

29.     On August 14, 2023, SCHNEIDER and Flisler held a follow-up Zoom conference call with ROKU with the *same representatives* from ROKU, Franzetta, Bova, and Kohn. As part of the negotiations on this call, a discussion was had with

regard to a deal of licensing fees and/or a deal on a revenue sharing basis. The meeting ended with the parties agreeing to continue their negotiations. It is a standard customary practice in the media industry for deals of this nature to be negotiated over a long period of time. (Exhibit 13)

30.    On or about August 18, 2023, Flisler and X-GAMES parted ways. Notwithstanding Flisler's departure, SCHNEIDER continued working on the deals that he had already started and engaged.

31.    On or about August 21, 2023, SCHNEIDER sent an email to Jeff Moorad of MSP Sports Capital, the primary investor in X-GAMES, informing him that he wished to update him on the status of the negotiations that he had been involved in on behalf of X-GAMES, including with ROKU. He requested to have a call with Moorad. (Exhibit 14)

32.    That same night, Moorad replied that X-GAMES was interested in continuing negotiations with streaming platforms. (Exhibit 15)

33.    Scott Guglielmino, Steve Flisler's replacement at X-GAMES, sent SCHNEIDER an email on August 22, 2023, requesting to have a call with SCHNEIDER. (Exhibit 16)

34.    On August 24, 2023, Guglielmino held a Zoom call with SCHNEIDER. Also present on the call was Umar Hussein. They discussed what SCHNEIDER had done so far on behalf of X-GAMES with ROKU. He asked about SCHNEIDER'S contract, and requested a copy of it, which SCHNEIDER provided for him.

SCHNEIDER informed him that since they were still in active negotiations, his contract – the AGREEMENT, had automatically rolled over for another 90 days. (Exhibit 17)

35.    On August 28, 2023, Guglielmino acknowledged receipt of the AGREEMENT via email and asked for another call to "level set." (Exhibit 18)

**Termination and Breach**

36.    On September 11, 2023, SCHNEIDER had a Zoom call with Guglielmino. At that time, Guglielmino told him that he was terminating the contract. He stated that Umar Hussein would be taking over SCHNEIDER'S duties. Guglielmino stated that CFO Justin Harris and CEO Steve Flisler did not have the authority to enter into the AGREEMENT. Guglielmino told SCHNEIDER that he knew this was wrong and that he wanted to make it right and worth SCHNEIDER'S while.

37.    Thereafter, SCHNEIDER sent Guglielmino an email on September 20, 2023 (Exhibit 19) with his invoice for his services for the period of 8/11/2023 to 9/11/2023 in the amount of $5,000 (Exhibit 20).

38.    Guglielmino acknowledged receipt on September 26, 2023, and stated that he would be in touch that week to close it out. (Exhibit 21)

39.    Neither Guglielmino or any other X-GAMES representative ever contacted SCHNEIDER about his unpaid invoices or his 10% commission.  Further,

COMPLAINT FOR DAMAGES

no one from X-GAMES ever contacted Schneider to explain why they terminated his contract.

40.     Hearing no response from Guglielmino, on October 6, 2023, SCHNEIDER's counsel sent a follow-up letter to Guglielmino on SCHNEIDER's behalf, reminding Guglielmino of X-GAMES' obligation under the AGREEMENT and demanding that he advise SCHNEIDER if X-GAMES entered into any agreement with a streaming platform. (Exhibit 22)

41.     On November 28, 2023, SCHNEIDER's counsel sent a letter to X-GAMES' counsel, David McManus, Esq. demanding that X-GAMES comply with its contract with SCHNEIDER. (Exhibit 23)

42.     Thereafter, on December 18, 2024, ROKU announced that it was launching streaming of X-GAMES and it started streaming X-GAMES content on ROKU in January, 2025. (Exhibit 24)

43.     Consequently, on December 19, 2024, SCHNEIDER's counsel sent X-GAMES' counsel, David McManus, Esq. a letter demanding that X-GAMES pay SCHNEIDER his 10% commission as per the terms of the AGREEMENT and demanding his Right to Audit. (Exhibit 25)

44.     By Email dated January 6, 2025, X-GAMES counsel, David McManus, Esq. wrote a letter to SCHNEIDER's counsel denying that SCHNEIDER had any role in putting together the deal with ROKU for X-GAMES, denying SCHNEIDER's right to audit and repudiating its AGREEMENT with SCHNEIDER. (Exhibit 26)

# FIRST CLAIM FOR RELIEF

## DECLARATORY JUDGMENT

### (Against All Defendants)

45.     Plaintiff realleges paragraphs 1 through 44 above and incorporates them by reference as if fully set forth herein.

46.     There is a substantial controversy and a live dispute between the parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. The dispute, therefore, between SCHNEIDER and Defendant X-GAMES is a justiciable controversy appropriate for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

47.     SCHNEIDER has fulfilled all of his obligations under the AGREEMENT and, therefore, is not in breach of the AGREEMENT with Defendant X-GAMES.

48.     Defendant X-GAMES has provided written notice to SCHNEIDER that it considers itself excused from performing its obligations under the AGREEMENT, including its obligations to timely make full payment of SCHNEIDER'S 10% Commission and to provide SCHNEIDER with a full accounting (See Exhibit 21 Letter from David McManus, Esq. ¶44, denying that SCHNEIDER had any role in X-GAMES' deal to stream its content on ROKU and refusing to permit an audit.)

49.     A declaratory judgment that the Commission provision of the AGREEMENT remains in full force and effect, will prevent the necessity of multiple

successive lawsuits to recover SCHNEIDER's 10% commission payment, each time

ROKU makes a payment to X-GAMES for streaming its content.

50.     Since the AGREEMENT provides in ¶ 3: "For clarity, Commission will

be paid to I.C. even if term has concluded," Plaintiff is entitled to the entry of a

judgment declaring that the Commission provision of the AGREEMENT remains in

full force and effect, and that because SCHNEIDER "started and engaged" the deal to

stream X-GAMES on ROKU, he is entitled to his 10% commission, as he was the

procuring cause.

## SECOND CLAIM FOR RELIEF

## FOR BREACH OF CONTRACT

### (Against All Defendants)

51.     Plaintiff realleges paragraphs 1 through 50 above and incorporates them

by reference as if fully set forth herein.

52.     This is a claim against Defendant X-GAMES for breach of contract

under California law. This court has supplemental subject matter jurisdiction over this

claim for relief under 28 U.S.C. §1367 because the breach of contract claim is so

related to other claims in this action that they form part of the same case or

controversy.

53.     As discussed more fully in ¶14 above, SCHNEIDER and X-GAMES

entered into an AGREEMENT on May 10, 2023 where X-GAMES agreed to pay

SCHNEIDER $5,000 per month, plus 10% commission to SCHNEIDER to start and engage a distribution deal to stream X-GAMES content on a streaming platform.

54.     On or about September 11, 2023, X-GAMES purported to terminate its AGREEMENT with SCHNEIDER. (¶36 above).

55.     SCHNEIDER has fulfilled all of his obligations under the AGREEMENT and is not in breach of the AGREEMENT with Defendants.

56.     SCHNEIDER was the procuring cause for ROKU to enter into an agreement with Defendant X-GAMES to stream X-GAMES content on ROKU's streaming platform – but for SCHNEIDER's work, X-GAMES would not have made this deal with ROKU.  SCHNEIDER is informed and believes and therefore alleges that X-GAMES negotiated the contract with the same representatives of ROKU that SCHNEIDER had introduced them to – Parker Bova and Joe Franzetta.

57.     At the time of X-GAMES' termination of its AGREEMENT with SCHNEIDER on September 11, 2023, X-GAMES was still in active negotiations with ROKU.

58.     Plaintiff is informed and believes and therefore alleges that the contract that X-GAMES entered into with ROKU was "started and engaged" by SCHNEIDER with ROKU's representatives, Parker Bova and Joe Franzetta.

59.     Defendant X-GAMES breached its AGREEMENT with SCHNEIDER by:

a) Failing and refusing to pay SCHNEIDER's $5,000 retainer for the period from 8/11/23 to 9/11/23;

b) Failing and refusing to permit an audit of its contract with ROKU and all funds that it has received from ROKU; and

c) Failing and refusing to pay SCHNEIDER his 10% Commission for the revenue generated from its contract with ROKU.

60.     As a direct and proximate result of Defendant's breach of contract, SCHNEIDER has suffered and continues to suffer damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

## <u>BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING</u>

### (Against All Defendants)

61.     Plaintiff realleges paragraphs 1 through 60 above and incorporates them by reference as if fully set forth herein.

62.     Implied in all contracts governed by California law is a covenant of good faith and fair dealing, which obligates the parties to act in good faith, to use their best efforts to deal fairly with one another, and to avoid impeding the other party from obtaining the benefits of the contract.

63.     Plaintiff has fully performed all of his covenants and obligations under the AGREEMENT, and he is in no manner or respect in breach thereof.

64.     X-GAMES has breached the AGREEMENT and its covenant of good faith and fair dealing by among other things, refusing to honor the AGREEMENT to pay SCHNEIDER his 10% Commission that he was entitled to since he was the "procuring cause" of the deal to stream X-GAMES on ROKU.

65.     Significantly, X-GAMES' counsel, David A. McManus, Esq. falsely claimed in his January 6, 2025 letter, (Exhibit 21) that: "a new representative of X-GAMES independently leveraged different relationships at ROKU, specifically with representatives Parker Bova and Joe Franzetta, who had no connection to Mr. Schneider." Yet X-GAMES was aware that SCHNEIDER had meetings with these same representatives at ROKU, Parker Bova and Joe Franzetta, about X-GAMES on many occasions, including the Zoom calls on May 26, 2023, June 2, 2023, June 15, 2023, the in-person meeting and presentation with them at ROKU's Santa Monica office on July 14, 2023, and on Zoom on August 14, 2023, since its CEO, Steve Flisler was present at all of those meetings  (See ¶s 19, 21, 24, 25, and 29 above and Exhibits 7, 9, and 13). Further, upon information and belief, the "new representative" that was being referenced is someone who was informed and aware of SCHNEIDER's dealings with ROKU.

66.     This bad faith denial of SCHNEIDER's critical role in procuring the deal for X-GAMES with ROKU was done for the specific purpose of interfering with and denying SCHNEIDER the right to receive the benefit of the AGREEMENT – his 10% Commission.

67.    As a result of X-GAMES' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
## FOR PROMISSORY ESTOPPEL
### (Against All Defendants)

68.    Plaintiff realleges paragraphs 1 through 67 above and incorporates them by reference as if fully set forth herein.

69.    Where an employee relies on a promise to his detriment, the employer may be estopped from denying the promise (i.e. the promise will be enforced) under a theory of promissory estoppel. "The elements of promissory estoppel are (1) a clear promise; (2) reliance, (3) substantial detriment, and (4) damages measured by the extent of the obligation assumed and not performed." *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 692 (internal quotes omitted).

70.    Defendant X-GAMES made clear and unambiguous promises to SCHNEIDER set forth in the AGREEMENT that he would receive a 10% Commission if he started and engaged in negotiations which led to the streaming of X-GAMES content on a streaming platform. SCHNEIDER reasonably relied upon X-GAMES' promises to his substantial detriment. Therefore, SCHNEIDER is entitled to damages i.e. his 10% Commission, and his $5,000 retainer.

71.     SCHNEIDER alleges in the alternative that to the extent that the AGREEMENT is found to be invalid for any reason, X-GAMES is nevertheless liable under the doctrine of promissory estoppel.

### FIFITH CLAIM FOR RELIEF

### FOR VIOLATION OF LABOR CODE §203 – WAITING TIME PENALTIES

**(Against All Defendants)**

72.     Plaintiff alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 71 as though fully set forth herein.

73.     *Labor Code* §203 provides that if an employer willfully fails to pay, without abatement or reduction, in accordance with *Labor Code* §§201 and 201.5 any wages of an employee who is discharged or who quits, the wages of the employee shall continue at the same rate, for up to thirty (30) days from the due date thereof, until paid or until an action therefore is commenced.

74.     Defendant X-GAMES willfully failed to pay SCHNEIDER his entire wages due and owing at the time of his termination, and has continued to fail to pay SCHNEIDER, despite SCHNEIDER's demand for payment of his last invoice for $5,000.

75.     X-GAMES willful failure to pay wages to SCHNEIDER violates Labor Code §203 because Defendant knew or should have known wages were due to

SCHNEIDER, because he sent them his invoice on September 11, 2023 (Exhibit 20) but Defendant failed to pay him.

76.    Thus, SCHNEIDER is entitled to recovery pursuant to Labor Code §203, in the amount of his daily wage multiplied by thirty (30) days.

77.    Pursuant to *Civil Code* §3287, SCHNEIDER seeks recovery of pre-judgment interest on all amounts recovered herein.

## SIXTH CLAIM FOR RELIEF

## FOR VIOLATION OF BUSINESS AND PROFESSIONS CODE §17200

### (Against All Defendants)

78.    Plaintiff alleges and incorporates by reference the allegations contained in paragraphs 1 through 77 above as though fully set forth herein.

79.    *Business & Professions Code* §17200 provides in pertinent part that: "…[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act…".

80.    *Business & Professions Code* §17205 provides that unless otherwise expressly provided, the remedies or penalties provided for unfair competition "are cumulative to each other and to the remedies or penalties available under all other laws of this state."

81.    *Business & Professions Code* §17204 provides that an action for any relief from unfair competition may be prosecuted by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition.

COMPLAINT FOR DAMAGES

82.     Defendants have engaged in unlawful, unfair and fraudulent business acts or practices prohibited by *Business & Professions Code* §17200, including those set forth in the preceding paragraphs of the Complaint, thereby depriving SCHNEIDER of the minimum working standards and conditions due to him under the Labor Code and/or the IWC Wage Orders, as specifically described herein.

83.     Defendants have engaged in unfair business practices in California by practicing, employing and utilizing the employment practices outlined in the preceding paragraphs, specifically, by requiring Plaintiff to perform the labor services complained of herein without the requisite compensation.

84.     Defendants' use of such practices constitutes an unfair business practice, unfair competition and provides an unfair advantage over Defendants' competitors.

85.     SCHNEIDER has suffered injury in fact and has lost money or property as a result of such unfair competition.

86.     SCHNEIDER seeks full restitution from Defendants, as necessary and according to proof, to restore any and all monies withheld, acquired and/or converted by Defendants by means of the unfair practices complained of herein.

87.     Further, if Defendants are not enjoined from the conduct set forth above, Defendants will continue to practice, employ and utilize the employment practices outlined in the preceding paragraphs.

88.     Therefore, SCHNEIDER requests that the Court issue a preliminary and permanent injunction prohibiting Defendants from engaging in the above conduct.

COMPLAINT FOR DAMAGES

89.     Plaintiff on behalf of himself, seeks the appointment of a receiver, as necessary, to establish the total monetary relief sought from Defendants.

## SEVENTH CLAIM FOR RELIEF

## FOR UNJUST ENRICHMENT

### (Against All Defendants)

90.     Plaintiff alleges and incorporates by reference the allegations contained in paragraphs 1 through 89 above as though fully set forth herein.

91.     To establish a claim for unjust enrichment, the Plaintiff must show: (1) the defendant received a benefit from the plaintiff, (2) the benefit was conferred at the plaintiff's expense, (3) it would be unjust for the defendant to retain the benefit without compensating the plaintiff. *Lectrodryer v. Seoul Bank* (2000) 77 Cal.App.4th 723, 726.

92.     Plaintiff Daniel Schneider conferred a benefit on X-GAMES, by performing substantial services under the Independent Contractor Agreement dated May 10, 2023 (the "AGREEMENT") (Exhibit 1). These services included initiating and engaging in negotiations with ROKU for the distribution of X-GAMES' content, including numerous meetings, correspondence, and a sales presentation at ROKU's Santa Monica office, as well as leveraging Plaintiff's industry connections at the Stream TV conference. (¶17-29, Exhibits 7-13).

93.     As a direct result of Plaintiff's efforts, X-GAMES secured a streaming deal with ROKU. ROKU announced the deal on December 18, 2024, and began

COMPLAINT FOR DAMAGES

streaming X-GAMES content in January, 2025 (¶42, Exhibit 24), generating significant revenue for X-GAMES.

94.    Plaintiff was entitled to a $5,000 monthly retainer and a 10% revenue commission generated from distribution deals he started and engaged, including the ROKU deal, with the commission clause explicitly surviving the termination of the AGREEMENT. (¶14, Exhibit 1)

95.    X-GAMES has retained the financial benefits of the ROKU deal without compensating Plaintiff for his services, including the $5,000 retainer and the 10% commission owed under the AGREEMENT (¶59).

96.    Despite Plaintiff's demands for payment, X-GAMES has failed and refused to pay Plaintiff the $5,000 retainer for the period of August 11 to September 11, 2023 (¶37, Exhibit 20), and the 10% commission on the revenue generated from the ROKU deal (¶59).

97.    It would be unjust for X-GAMES to retain the benefits of Plaintiff's services and the revenue from the ROKU deal without providing Plaintiff with the compensation owed under the AGREEMENT, as Plaintiff was the procuring cause of the ROKU deal (¶56).

98.    As a direct and proximate result of X-GAMES' actions, Plaintiff has suffered damages, including the loss of the $5,000 retainer, the 10% commission on ROKU revenue, and other economic losses, in the amount to be proven at trial.

**PRAYER**

COMPLAINT FOR DAMAGES

Case 2:25-cv-11774    Document 1    Filed 12/12/25    Page 26 of 27    Page ID #:26

WHEREFORE, SCHNEIDER prays for judgment against Defendants as follows:

1.     For such general, special and compensatory, actual and liquidated damages, according to proof at trial;

2.     For injunctive relief, according to proof;

3.     For prejudgment interest;

4.     For attorney's fees and costs pursuant to the prevailing party clause of the AGREEMENT, and Labor Code §218.5;

5.     For a Declaratory Judgment declaring that the Commission provision of the AGREEMENT remains in full force and effect and that Plaintiff SCHNEIDER is entitled to his 10% Commission of all revenue generated from the contract to stream X-GAMES' content on ROKU;

6.     For restitution of all benefits unjustly retained by Defendants, including but not limited to the $5,000 retainer and the 10% commission on revenue from the ROKU deal;

7.  For such other relief as the Court may deem proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all claims that jury is available for.

COMPLAINT FOR DAMAGES

Dated: December 12, 2025

_____

Eli M. Kantor
Attorney for Plaintiff
DANIEL SCHNEIDER

COMPLAINT FOR DAMAGES